UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT BLUEFIELD

GRANT E. GAZVODA

        Plaintiff,

v.                                                            CIVIL ACTION NO.  1:23-cv-00523

GARRISON PROPERTY AND CASUALTY
INSURANCE COMPANY, and
THOMAS MALATINO, and
WILLIAM SCANLON, and DAVID BROOKS,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

        Pending are (1) Plaintiff Grant E. Gazvoda's Motion for Partial Summary Judgment [ECF 119], filed July 5, 2024, and (2) Defendants Garrison Property and Casualty Insurance Company ("Garrison"), Thomas Malatino, William Scanlon, and David Brooks' (collectively "Defendants") Omnibus Motion for Summary Judgment [ECF 168], filed October 1, 2024. The parties responded in opposition to each other's motions on July 22, 2024 [ECF 139-1], and October 15, 2024. [ECF 172].

**I.**

        On October 29, 2022, beginning sometime between the evening hours of 8:47 and 9:31 p.m., Mr. Gazvoda's home in Bluefield was destroyed by fire. [ECF 139-1 at 8-9 (citing ECF 138-31, 138-32)]. The 1905, single family home was purchased by Mr. Gazvoda for $8,000 in 2019. [*See* ECF 138-32 at 4, 139-1 at 2]. At the time of the fire, the home was insured for $265,000, with $132,500 in personal property protection, under a homeowner's insurance policy (the

"Policy") issued by Garrison.[1] While the Policy insures losses that are "sudden and accidental," it excludes intentional losses "arising out of any act any 'insured' commits or conspires to commit with the intent to cause a loss." [ECF 119-1 at 23, 27]. The Policy also requires the insured to "[c]ooperate with [Garrison] in the investigation of a claim." [*Id*. at 30].

On November 2, 2022, the West Virginia State Fire Marshal's Office investigated the fire scene. [ECF 119-2 at 13]. Assistant State Fire Marshal R.S. Rodes ultimately ruled the cause of the fire undetermined. [*Id*. at 13]. Specifically, he concluded as follows:

> Based on the physical examination of the fire scene and an analysis of the information obtained during any follow-up investigation, it is the opinion of the undersigned fire investigator that the classification of the cause of this fire is undetermined.

> Based on the examination of the fire scene and in conjunction with witness statements, it is the opinion of the undersigned fire investigator that the general area of origin was located within [the] kitchen area located at the interior C/D corner of the dwelling. However, based on the extent of fire damage this area had sustained, the undersigned fire investigator was unable to determine the exact ignition sequence (competent ignition source, "first-fuel" ignited, and the actions or inactions which brought these items together) for this fire.

[*Id*.]. Mr. Rodes further concluded the hypotheses that the fire was either the result of an accidental cause or an intentional, human-related act "could neither be proven nor disproven as of the date of this report." [*Id*. at 17].

After receiving notification of the loss by Mr. Gazvoda, Garrison began its own investigation into the fire and resulting claim around the same time. United Services Automobile Association ("USAA") Adjuster William Scanlon was assigned to Mr. Gazvoda's claim and was recommended by USAA's Special Investigation Unit ("SUI") to "perform a joint examination of

---

[1] Mr. Gazvoda first obtained the Policy on April 14, 2022, with an effective date of April 20, 2022. [ECF 138-3]. On August 17, 2022, the Policy automatically increased from $261,000 to $265,000 in dwelling coverage and $130,500 to $132,500 in personal property protection, with all coverage running from August 17, 2022, through April 20, 2023. [*Id*., ECF 119-1].

[Mr. Gazvoda's] property with an origin and cause investigator based on safety concerns." [ECF 139-1 at 10]. On November 7, 2022, Mr. Scanlon and Senior Fire Investigator Lisa Hess with Keystone Excerpts and Engineers completed their joint investigation of the property. [*See* ECF 138-32]. Unlike the Fire Marshal's Office, Ms. Hess located additional evidence that allowed her to determine the ignition sequence and cause of the fire, namely, a blue cloth rag that had been placed and found inside the exterior kitchen wall. [*See id*. at 6-8]. Her findings are summarized as follows:

> Based upon Keystone's investigation, the available evidence, the Fire Investigator's education, training, and experience, the following conclusions have been reached within a reasonable degree of scientific certainty:
>
> - The first area of origin was on the back side exterior kitchen wall.
> - The second area of origin was on the right side exterior kitchen wall.
> - The first fuel ignited was a cloth rag.
> - The competent ignition source was an open flame.
> - The ignition sequence was open flame applied to a cloth rag trailer [*sic*] brought the exterior wood siding to its ignition temperature.

[*Id*. at 4]. Simply put, Ms. Hess concluded the cause of the fire resulted from the blue cloth rag being set ablaze by open flame and subsequently used to ignite the exterior wood siding of the home. During her deposition, Ms. Hess explained it was likely this evidence was not located during the investigation conducted by the fire marshal inasmuch as no excavation of the exterior kitchen walls had occurred. [*See* ECF 138-37 at 3]. She further explained while excavation of the interior kitchen had previously occurred, the resulting debris had been thrown outside the kitchen window "and on top of where the actual origins" (i.e., the blue cloth rag inside the exterior kitchen wall) were found. [*Id*.].

Based on the findings of Ms. Hess' investigation, USAA Special Investigator Thomas Malatino was referred to further investigate Mr. Gazvoda's claim. On November 10 and 22, 2022, Mr. Malatino took recorded statements from Mr. Gazvoda, during which he provided an

alibi for the night of the fire. Reduced to its essence, Mr. Gazvoda has maintained he spent October 28, 2022, -- the night before the fire -- drinking at his friend Charles Campbell's home in Tazewell, Virginia, where he remained until at least 7:00 p.m. on October 29, 2022, the day of the fire. [*See, e.g.*, ECF 138-14]. At some point after 7:00 p.m., he claims Mr. Campbell drove him to Marion, Virginia to fix an unidentified elderly woman's "machine." [*Id*. at 5]. On the return trip from Marion to Tazewell, he claims he and Mr. Campbell stopped for gas at approximately 10:00 p.m. in Thompson Valley. [*Id*. at 8]. He asserts it was around this time he received a Facebook message from Angela Coleman notifying him of the fire, at which point he called 911.[2] [*Id*. at 8-9]. He then claims he and Mr. Campbell returned to Mr. Campbell's home in Tazewell, and he called his friend Joshua Tiller to pick him up and take him to the fire scene. [*Id*. at 9]. When Mr. Gazvoda arrived at his home, the fire had been extinguished. He has vehemently denied being at his home at any point on October 29, 2022, and has consistently accused his ex-girlfriend Jennifer Lewis of starting the fire.[3]

Mr. Malatino's investigation ultimately spanned from November 2022 through March 2023. In addition to the recorded statements, Mr. Malatino's investigation included, *inter alia*, unsuccessful contact attempts with individuals Mr. Gazvoda claimed he was with on the night

---

[2] The 911 records indicate Mr. Gazvoda called 911 at 11:36 p.m., during which he immediately accused his ex-girlfriend of starting the fire. [ECF 138-34]. Defendants note that although Mr. Gazvoda claims he was only with Mr. Campbell at this time, it is a woman's voice that can be heard stating "Thompson Valley" in the background of the 911 recording when Mr. Gazvoda is asked about his location by the 911 operator. [*See* ECF 139-1 at 9].

[3] According to Ms. Lewis' mother Jeanie Lewis, Ms. Lewis has a diminished mental capacity and cannot read or drive. [ECF 138-8 at 7-9]. At the time of Jeanie's deposition, Ms. Lewis was committed to a mental health facility inasmuch as she was deemed incompetent to stand trial in another, unrelated criminal matter. [*Id*. at 7; *see also* ECF 139-3 at 14]. An officer with the Bluefield Police Department also described Ms. Lewis as "low functioning" and having mental health issues. [ECF 139-3 at 16].

of the fire, a review of Mr. Gazvoda's financial position evidencing financial strife, and a review of his SafePilot[4] data, which produced purported discrepancies in his alibi.[5] On March 8, 2023, Mr. Malatino was informed via letter Mr. Gazvoda had retained counsel, which was accompanied by a three-page personal property inventory claiming $114,038.24 in lost items. [ECF 138-41]. The letter also demanded the entirety of the dwelling coverage be paid to Mr. Gazvoda. [*Id.*].

On March 15, 2023, Mr. Malatino referred Mr. Gazvoda's claim to USAA SUI Case Manager David Brooks "for review of file and possibility of [examination under oath] to address discrepancies in the contents portion of the fire loss . . ." [ECF 139-2 at 26]. Mr. Brooks subsequently sought and retained outside counsel Trevor Taylor to conduct an examination under oath ("EUO") of Mr. Gazvoda and provide a coverage opinion respecting his claim. On April 26, 2023, Mr. Taylor conducted Mr. Gazvoda's EUO. [*See* ECF 139-5]. While Mr. Gazvoda reiterated the same information respecting his whereabouts on the date of the fire, for the first time he claimed he had been working ███████████████████████████████████ for a year, earning daily pay. [*Id.* at 5]. He also indicated Mr. Campbell was a target of his ████████ ████████. [*Id.* at 27]. Both of these assertions[6] were later refuted by the Virginia State Police

---

[4] Mr. Gazvoda was enrolled in USAA's SafePilot program, which tracks and logs -- via an app on the insured's phone -- "trips taken by drivers in order to offer discounts to customers with safe driving habits." [ECF 139-1 at 7].

[5] According to Defendants, Mr. Gazvoda's SafePilot data shows a trip beginning from Bluefield, Virginia at 11:43 p.m. on October 28, 2022, and terminating in Bluewell, West Virginia at 12:14 a.m. on October 29, 2022, while Mr. Gazvoda maintains he was at Mr. Campbell's home during this time. [*See* ECF 138-23]. Defendants further note neither of these locations are near Mr. Campbell's home in Tazewell. Additionally, despite a trove of SafePilot data for the days prior to the fire, Defendants note a curious absence of data from the date of the fire, aside from the trip previously mentioned. [*See* ECF 139-1 at 7 n.9].

[6] Defendants contend these false assertions, among others, hindered and delayed its ensuing investigation, demonstrating Mr. Gazvoda's lack of cooperation. [*See* ECF 139-1 at 19-20].

Chief Noah Horn, who testified he had never heard of Mr. Campbell and that Mr. Gazvoda ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. [ECF 139-10 at 8-10].

Following Mr. Gazvoda's EUO, Mr. Taylor continued with his investigation through August 2023. This included conducting interviews with witnesses such as Mr. Tiller, Ms. Coleman, Ms. Lewis, Ms. Lewis' mother, conversations with both the Virginia State Police and the Bluefield, West Virginia Police Department, and unsuccessful attempts to meet with Mr. Campbell in person.[7] These investigative efforts revealed, *inter alia*, the following: (1) Mr. Gazvoda's deteriorating financial situation leading up to the fire, (2) a call from Mr. Gazvoda to USAA in early October 2022 -- approximately a month before the fire -- attempting to report a loss for an alleged fire set to his mattress by his ex-girlfriend Ms. Lewis, (3) a call around this same time from Mr. Gazvoda to Detective Adams with the Bluefield Police Department reporting the alleged mattress fire, which Detective Adams characterized as "awkward," leading him to believe Mr. Gazvoda may attempt to burn his house down[8] for the insurance payout, (4) evidence demonstrating Mr. Gazvoda had stopped residing at his home in mid-October 2022, (5) evidence indicating Mr. Gazvoda had begun storing his valuable items in the home of Ricky Reed, (6) another call from Mr. Gazvoda to USAA in mid-October 2022, inquiring whether his policy was still active and setting up a payment plan to ensure his policy would not cancel at the end of October, (7) Safe-Pilot data negating portions of Mr. Gazvoda's alibi, (8) officer testimony stating

---

[7] Mr. Campbell was eventually deposed as part of this litigation. [*See* ECF 138-50]. While he testified he was with Mr. Gazvoda when he was informed his house was on fire, he could not recall any other specifics about their evening together on the date of the fire beyond this limited point. [*Id.*].

[8] Detective Adams testified the conversation was so "awkward" that when he hung up the phone, he verbally told other officers at the station that Mr. Gazvoda was "going to burn his house down." [ECF 138-11 at 5].

Mr. Gazvoda was seen taking the backroad to his home at 4:00 a.m. on the morning of the fire, further negating portions of his alibi, (9) call logs and ADT records appearing inconsistent with the alibi, and (10) purported statements made by Ms. Lewis and her mother Jeanie[9] to Mr. Taylor that Mr. Gazvoda had stated he was going to burn down his home for the insurance payment.

Based on the above information and the entirety of the investigation, Mr. Taylor agreed with Garrison's decision to deny Mr. Gazvoda's claim. [ECF 139-6 at 4-5]. On September 21, 2023, Mr. Brooks, on behalf of Garrison, notified Mr. Gazvoda via detailed letter of the information gathered during the investigation and Garrison's resulting claim-denial decision, citing the exclusions and provisions of the Policy previously listed above. [*See* ECF 139-11]. Simply stated, Garrison informed Mr. Gazvoda his claim was being denied inasmuch as its investigation indicated he had intentionally caused the fire, and he had failed to fully cooperate with the ensuing investigation.

On August 4, 2023, Mr. Gazvoda instituted this action, alleging breach of contract (Count I) and common law bad faith (Count II) against Garrison, and a violation of the West Virginia Unfair Trade Practices Act ("WVUTPA") against all Defendants (Count III). On July 5, 2024, Mr. Gazvoda moved for partial summary judgment on "the issue of coverage," which the Court construes as a motion for partial summary judgment on his Count I breach of contract claim against Garrison. He contends Garrison improperly denied his claim inasmuch as (1) Garrison lacks direct evidence placing him at the fire scene as conceded by Mr. Malatino, Scanlon, and Brooks (the "individual defendants"), and (2) he fully cooperated with the claim investigation.

---

[9] Jeanie Lewis also testified during her deposition that Mr. Gazvoda "was always going around threatening he was going to burn the house down," stating "he wanted money." [ECF 138-8 at 12].

[*See* ECF 120]. He further contends Garrison's reliance on any circumstantial evidence to demonstrate he intentionally caused the fire amounts to nothing more than mere speculation and "is subject to more than one interpretation[.]" [ECF 143 at 3]. He likewise challenges Garrison's circumstantial evidence as lacking credibility and offers contrary evidence that he contends could arguably support his theory that Ms. Lewis started the fire, which he claims Garrison and its investigators intentionally ignored. [*Id*. at 4-6].

On October 1, 2024, Defendants moved for summary judgment on Mr. Gazvoda's claim for punitive damages, and the individual defendants moved for summary judgment as to their alleged violations of the WVUTPA contained in Count III.[10] Respecting punitive damages, Defendants contend Mr. Gazvoda lacks sufficient evidence to demonstrate they acted with actual malice in denying his claim. [*See* ECF 169 at 2-10].  Respecting the WVUTPA violations, the individual defendants assert Mr. Gazvoda has failed to adduce any evidence demonstrating how they violated the WVUTPA. [*See id*. at 11-17]. To the contrary, Mr. Gazvoda contends, *inter alia*, deposition testimony from the individual defendants and Defendants' intentional disregard of competing evidence demonstrates their failure to conduct a reasonable investigation into his claim, creating a genuine dispute of material fact on both issues. [*See, e.g.*, ECF 172 at 11-15]. The Court will address each of the parties' motions in turn.

**II.**

### A.    *Governing Standard*

*Federal Rule of Civil Procedure* 56 provides that summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant

---

[10] To the extent former Defendant USAA Casualty Insurance Company ("USAA") sought summary judgment on Count III, the same is moot inasmuch as USAA was voluntarily dismissed from this action on December 17, 2024. [*See* ECF 203].

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the nonmoving

party to show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 246 (1986). "The nonmoving party must do so by offering 'sufficient proof in the

form of admissible evidence' rather than relying solely on the allegations of her pleadings."

*Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (quoting *Mitchell v. Data*

*Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993)). The Court must "view the evidence in the light

most favorable to the [nonmoving] party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (internal

quotation marks and citation omitted); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651,

659 (4th Cir. 2018).

When faced with cross-motions for summary judgment, the Court applies the above

standard and must consider "each motion separately on its own merits to determine whether either

of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th

Cir. 2003) (internal quotation marks omitted). "The court . . . cannot weigh the evidence or make

credibility determinations." *Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 569 (4th Cir.

2015); *see Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). In general, if "an issue as

to a material fact cannot be resolved without observation of the demeanor of witnesses in order to

evaluate their credibility, summary judgment is not appropriate." Fed. R. Civ. P. 56 advisory

committee's note to 1963 amendment.

**B.      *Mr. Gazvoda's Motion for Partial Summary Judgment***

Under West Virginia law, a policyholder may be denied coverage under an

intentional acts exclusion when the policyholder "(1) committed an intentional act *and* (2)

expected or intended the specific resulting damage." Syl. Pt. 7, *Farmers & Mechanics Mut. Ins.*

*Co. of West Virginia v. Cook*, 210 W. Va. 394, 396, 557 S.E.2d 801, 803 (2001) (emphasis in

original). "An insurance company seeking to avoid liability through the operation of an exclusion has the burden of proving the facts necessary to the operation of that exclusion." Syl. Pt. 3, *Cook*, 201 W. Va. at 396, 557 S.E.2d at 803.

In the seminal case of *Hayseeds, Inc. v. States Farm Fire & Casualty*, 177 W. Va. 323, 352 S.E.2d 73 (1986), the Supreme Court of Appeals of West Virginia approved of the following jury instruction -- despite recognizing it was "by no means a model instruction" -- in a similar claim denial action brought by a policyholder against the insurance company:

> While such proof of such a defense involves proof of a crime, arson, this is not a criminal case but a civil action upon a fire insurance policy. Therefore, State Farm need not prove beyond a reasonable doubt that the plaintiff voluntarily and intentionally burned their business. Such proof need only be by a preponderance of the evidence. However, such proof of voluntary and intentional burning should be clear and satisfactory, taking into consideration the presumption of innocence in such cases, which the evidence must be sufficient to overcome, and must do more than establish a basis for mere suspicion, speculation or conjecture. Where circumstantial evidence is relied on by State Farm, such evidence must be such as does more than throw a mere suspicion of guilt on the plaintiff, and the inference or presumption to which the facts give rise must be strong and almost inevitable. If the circumstances are such as to be fairly susceptible of two constructions, the one that frees the plaintiff from the imputation of fraud may be accepted.

*Hayseeds*, 177 W. Va. at 326-27, 352 S.E.2d at 76-77. At bottom, the Supreme Court of Appeals made clear that "where the defense made to the action involves the charge of an unlawful act, fraud, or even bad faith, a preponderance of the evidence as in any other civil case, is sufficient to sustain the charge . . . ." *Id*. at 327, 352 S.E.2d at 77 (internal citations and quotations omitted).

As evidenced by the recitation of facts above, the central question in this case reduces to whether Mr. Gazvoda intentionally caused the fire that damaged his home and/or failed to cooperate in Garrison's ensuing investigation. Garrison contends -- with sufficient supporting evidence -- Mr. Gazvoda is responsible for the fire and gave false statements to investigators,

which Mr. Gazvoda counters and denies. This evidentiary parting of ways gives rise to an inescapable genuine issue of material fact, rending summary judgment inappropriate.

### C.    *Defendants' Omnibus Motion for Summary Judgment*

Section 33-11-4(9) of the WVUTPA prohibits an array of unfair claim settlement practices, including, *inter alia*, "[m]isrepresenting pertinent facts or insurance policy provisions relating to coverages at issue," "[f]ailing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies," "[r]efusing to pay claims without conducting a reasonable investigation based upon all available information," "[f]ailing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed," and "[n]ot attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." W. Va. Code § 33-11-4(9)(a), (b), (d)-(f). The Supreme Court of Appeals of West Virginia has recognized that "[w]hether an insurer refused to pay a claim without conducting a reasonable investigation based on all available information under . . . [section] 33-11-4(9)(d) . . ., and whether liability is reasonably clear under . . . [section] 33-11-4(9)(f) . . . ordinarily are questions of fact for the jury." Syl. Pt. 3, *Jackson v. State Farm Mut. Auto. Ins. Co.*, 215 W. Va. 634, 637, 600 S.E.2d 346, 349 (2004); *see also Hicks ex rel. Saus v. Jones*, 217 W. Va. 107, 115, 617 S.E.2d 457, 465 (2005) (explaining "the reasonableness of an insurance company's conduct ordinarily is a question of fact for the jury that should not be determined as a matter of law by a trial court.") (cleaned up).

To establish a violation of section 33-11-4(9), a plaintiff "must demonstrate that the insurer (1) violated the UTPA in the handling of the claimant's claim and (2) that the insurer committed violations of the UTPA with such frequency as to indicate a general business practice." *Holloman v. Nationwide Mut. Ins. Co.*, 217 W. Va. 269, 276, 617 S.E.2d 816, 823 (2005) (citing

*Jenkins v. J.C. Penney Cas. Ins. Co.*, 167 W. Va. 597, 610, 280 S.E.2d 252, 260 (1981)). "A cause of action exists in West Virginia to hold a claims adjuster employed by an insurance company personally liable for violations of the [WVUTPA], W. Va. Code §§ 33-11-1 to – 10." Syl. Pt. 1, *Taylor v. Nationwide Mut. Ins. Co.*, 214 W. Va. 324, 325, 589 S.E.2d 55, 56 (2003).

While section 33-11-4(9) "requires more than a single isolated violation in order to show a general business practice, a claimant may produce sufficient evidence of this in a single claim." *Elmore v. State Farm Mut. Auto. Ins. Co.*, 202 W. Va. 430, 439, 504 S.E.2d 893, 902 (1998); *see also Dodrill v. Nationwide Mut. Ins. Co.*, 201 W. Va. 1, 12-13, 491 S.E.2d 1, 12-13 (1996) (explaining "separate, discrete acts or omissions, each of which constitute violations of different sub-paragraphs in W. Va. Code § 33-11-4(9), may indeed demonstrate a 'general business practice' in the handling of a single claim, the focus of which would tend to show frequent and rather general disregard for the several proscriptions separately set out in the relevant statute.").

Furthermore, under West Virginia law, whether an insurer is subjected to punitive damages for its alleged bad faith is governed by the Supreme Court of Appeals of West Virginia's decision in *Hayseeds*, which held that:

> [P]unitive damages for failure to settle a property dispute shall not be awarded against an insurance company unless the policyholder can establish a high threshold of actual malice in the settlement process. By "actual malice" we mean that the company actually knew that the policyholder's claim was proper, but willfully, maliciously and intentionally denied the claim. We intend this to be a bright line standard, highly susceptible to summary judgment for the defendant, . . . [citation omitted]. Unless the policyholder is able to introduce evidence of intentional injury—not negligence, lack of judgment, incompetence, or bureaucratic confusion—the issue of punitive damages should not be submitted to the jury.

*Hayseeds*, 177 W. Va. at 330-31, 325 S.E.2d at 80-81; *see also* Syl. Pt. 5, *McCormick v. Allstate Ins. Co.*, 197 W. Va. 415, 417, 475 S.E.2d 507, 509 (1996) (quoting Syl. Pt. 2, *Hayseeds*, 177 W. Va. at 323, 352 S.E.2d at 73) ("An insurer cannot be held liable for punitive damages by its refusal

to pay on an insured's property damage claim unless such refusal is accompanied by a malicious intention to injure or defraud."). This standard has been extended to claims asserted under the WVUTPA. *McCormick v. Allstate Ins. Co.*, 202 W. Va. 535, 540, 505 S.E.2d 454, 459 (1998).

As noted above, while Defendants challenge the sufficiency of Mr. Gazvoda's evidence with respect to punitive damages and the individual defendants' purported violations of the WVUTPA, Mr. Gazvoda relies on evidence such as deposition testimony from the individual defendants and Defendants' intentional disregard of evidence pointing to Ms. Lewis as the culprit of the fire to challenge the reasonableness of the investigation into his claim. [*See, e.g.*, ECF 172 at 11-12]. He also points to evidence that could potentially demonstrate misrepresentations were made in Garrison's denial letter authored by Mr. Brooks. [*See id*. at 10]. Moreover, while the final decision respecting coverage may not have been up to the individual defendants, it is evident each of them were involved in various parts of the investigation as a whole. In sum, when viewed in the light most favorable to Mr. Gazvoda, the Court concludes the evidence adduced is minimally sufficient to create a genuine dispute of fact on his punitive damages claim and the multiple alleged WVUTPA violations. The Court would expect to revisit the matter -- on proper motion -- at the conclusion of Mr. Gazvoda's case.

### III.

Based on the foregoing discussion, Mr. Gazvoda's Partial Motion for Summary Judgment [**ECF 119**] and Defendants' Omnibus Motion for Summary Judgment [**ECF 168**] are **DENIED**.

The Clerk is directed to send a copy of this written opinion and order to counsel of record and any unrepresented parties.

ENTER:  February 6, 2025

Frank W. Volk
Chief United States District Judge

13